395 So.2d 310 (1980)
Dr. Doyle F. PHILIPPE
v.
BROWNING ARMS COMPANY et al.
No. 66001.
Supreme Court of Louisiana.
May 19, 1980.
Dissenting Opinion September 24, 1980.
On Rehearing March 2, 1981.
*311 John A. Lieux, Gonzales, A. Kennon Goff, III, Goff, Goff, Levy & Hearn, Ruston, for plaintiff-respondent.
Raymond Morgan Allen, Allen, Gooch & Bourgeois, Lafayette, for defendants-applicants.
*312 ELLIS, Justice Ad Hoc.
Dr. Doyle F. Philippe filed this suit to recover damages for personal injuries suffered when his shotgun accidentally discharged and severed his right thumb. The trial court found that the cause of the accident was a defect in the design and manufacture of the safety mechanism of the shotgun, and rendered judgment in favor of plaintiff for $900,067.00. On appeal, the Court of Appeal amended the judgment to award $25,000.00 in attorneys' fees, and otherwise affirmed. Defendants have applied for writs of certiorari, assigning as error, inter alia, the award of attorneys' fees and the award of $800,000.00 in loss of future earnings. We granted certiorari to review the ruling of the Court of Appeal in both respects.
In ruling on plaintiff's demand for attorneys' fees herein, the Court of Appeal summarized plaintiff's argument, and its holding as follows:
"Plaintiff, in his answer to this appeal, alleges the trial court erred in failing to award him reasonable attorney fees under Civil Code Article 2545, which provides:
The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages.
"He contends that since a manufacturer is presumed to have knowledge of the defect and since the defect in the shotgun was not declared to him, this article should apply and allow him to recover reasonable attorney fees in addition to damages for pain and suffering and loss of future earnings. Although this article is contained in the section of the Code dealing with redhibition, plaintiff claims it may be applied in cases where personal injury damages alone are sought. He reasons that since Louisiana courts employ fact pleading rather than requiring a litigant to plead the `theory of the case', he is entitled under the facts actually proven to whatever relief the law allows, and it makes no difference whether the suit is technically termed an act in redhibition or one in tort. Plaintiff argues that any time a plaintiff buyer shows he has suffered damage caused by a defect in a product manufactured by the defendant, the relief provided in article 2545 is available to him regardless of whether his petition includes a demand for the return of the purchase price of the defective product.
"We agree. In Harris v. Bardwell, 373 So.2d 777 (La.App. 2d Cir. 1979), this court recently stated there is no difference in `damages' as contemplated by Civil Code Article 2315 and `damages' under Article 2545. There we noted that recovery for damage caused by a defective product smacks of both contract and tort and that recovery may be had under either theory. Although these statements in that case may be dicta since the plaintiff had sought recovery under both theories, we find they are a correct statement of the law. See also Albritton v. McDonald, 363 So.2d 925 (La.App. 2d Cir. 1978); Townsend v. Cleve Heyl Chevrolet Buick, Inc., 318 So.2d 618 (La.App. 2d Cir. 1975); C. T. Boudreaux Lumber Co. v. Sherrwood Homes, 371 So.2d 326 (La. App. 4th Cir. 1979).
"We have held that article 2545 does not exclude personal injury damages which are factually and legally caused by the defective product. See Harris, supra. This permits an award of attorney fees despite the fact that plaintiff's petition does not demand rescission of the sale. Whenever plaintiff's petition alleges facts sufficient to entitle him to redhibition (defect, damage and causation), he is also entitled to recover reasonable attorney fees under article 2545 regardless of whether his suit is labeled in tort or in redhibition.
"The trial of this case took six days and required extensive discovery and pre-trial preparation. We award $25,000.00 as reasonable attorney fees."
It is, of course, true that Louisiana has a fact pleading system, and that recovery *313 may be had under any legal theory which is justified by the well pleaded facts in the petition. See Articles 862, 891, 1841, Code of Civil Procedure. It is likewise true that the same set of facts might give rise to more than one cause of action, based on more than one legal theory.
If, as in this case, one is injured by a defective product which one has purchased, there arises a redhibitory action, for the rescission of the sale, and a tort action for the personal injuries suffered. See Articles 2520 et seq. and 2315 et seq., Civil Code. Article 2545 of the Civil Code, which is found in the section thereof dealing with the redhibitory action, provides:
"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages."
If, as argued by plaintiff, and as found by the Court of Appeal the "damages" contemplated by the above article include those for personal injuries and loss of future income which are caused by the defective product, then plaintiff would be entitled to attorneys' fees under Article 2545. Defendants, however, argue that the redhibitory action, which is founded on the breach of an implied warranty, is purely an action in contract, and that damages in a contract action are limited by Article 1934 of the Civil Code to "the amount of the loss he has sustained, and the profit of which he has been deprived...." They point out that the courts of this state have consistently interpreted Article 1934 so as to preclude the recovery of non-pecuniary damages in suits arising in contract. Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La.1976). This same line of reasoning would appear to preclude the award of other types of personal injury damages, including loss of future earnings, in a redhibitory action. This court has held that, in cases in which one is injured by a defective product, the duty of the manufacturer is fixed by that part of the Civil Code dealing with sales, but that recovery for the injury arises under Article 2315. See Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). It would therefore seem obvious that, although a plaintiff is not required to restrict himself to one theory for recovery, the courts must, in many cases, characterize the cause of action so as to determine the appropriate standard for recovery.
Admittedly, there is nothing in the language of Article 2545 itself which would preclude the award of damages for personal injuries, and appropriate attorneys' fees as well. However, that article is only part of the series of articles dealing with the redhibitory action. These form a scheme by virtue of which the purchaser of a defective product can recover the purchase price and expenses of the sale, and, in the case of the bad faith seller, such damages as relate to the transaction, as well as reasonable attorneys' fees in connection therewith.
His right to recover for personal injuries, which are caused by the same defect, arises under Article 2315, et seq., which do not provide for the recovery of attorneys' fees. See Gordon v. General Motors Corporation, 323 So.2d 496 (La.App. 3rd Cir. 1975); Reeves v. Great Atlantic & Pacific Tea Co., 370 So.2d 202 (La.App. 3rd Cir. 1979).
We therefore hold that in this case, in which rescission of the sale was not sought by plaintiff, but only damages arising from his personal injuries, attorneys' fees under Article 2545 are not payable.
As to the second assignment of error, defendants argue that the trial court erred in awarding $800,000.00 for loss of future earnings. Defendants contend this award to be an abuse of discretion of the trier of fact; contrary to the jurisprudence and to the facts established at trial.
The trial court was supplied with expert testimony from three economists. Each one produced different sets of figures based upon various combinations of factors. When superimposed upon a time continuum, these calculations produced figures which were less or greater than the amount awarded. The trial court states that it was most impressed by the testimony of Dr. Chisholm who related that the fairest computation *314 would be based on a three per cent annual productivity increase, a four per cent annual inflation rate, and a seven per cent discount rate. The court went on to note that a deduction was made from his final figure of $970,000.00, owing to mitigation by Dr. Philippe, who had found a position as dental consultant with the State.
The trial court made no deduction for the contributions made to his earnings by Dr. Philippe's wife, who was her husband's receptionist, dental assistant, and general record keeper, and who never drew a salary. One of the economists, Dr. Boudreaux, who relied on the Survey of Dental Practice published by the American Dental Association, figured her contribution in accord with the general ratio of dentists' payments to employees per dollar cash receipts or income. This ratio of 16-16½% placed the value of Mrs. Philippe's contribution to the dental practice at approximately $11,700.00 in 1976.
Mrs. Philippe was not injured in the accident. She can continue to work in the future, and therefore her contribution to the income of the couple should be subtracted from his earnings in order to project a more accurate picture of his past and future earning loss.
For the foregoing reasons, the decision of the Appellate Court is affirmed in part and reversed in part. The decision of the trial court to deny attorneys' fees is reinstated. The case is remanded to the Court of Appeal to determine the proper award for loss of future earnings, in accordance with the reasons expressed herein.
Affirmed in part; reversed in part.
WATSON, J., concurs without written reasons.
DIXON, C. J., dissents with reasons.
CALOGERO, J., dissents and assigns reasons.
DENNIS, J., dissents with reasons.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
Civil Code article 2545 clearly provides that the seller is answerable in damages, in addition to "repayment of the expenses, including reasonable attorneys' fees ..."
CALOGERO, Justice, dissenting.
I dissent from the majority opinion insofar as it holds that plaintiff is not entitled to recover attorney's fees. I believe that the Court of Appeal was correct on this issue. La.Civ.Code art. 2545 allows such a recovery in this case.
DENNIS, Justice, dissenting.
I dissent for the reasons assigned by DIXON, C. J., and CALOGERO, J.

ON REHEARING
LEMMON, Justice.
In this products liability case we granted applications for rehearing by both sides in order to reconsider (1) our reduction on original hearing of the trial court's award of damages in the amount of $800,000 for impairment of earning capacity and (2) our denial of attorney's fees against the manufacturer.
Impairment of Earning Capacity
At the time of the February 21, 1976 accident, in which plaintiff lost the thumb of his dominant hand, plaintiff was a 42-year old dentist who had been practicing his profession since 1960. After the accident he could no longer practice dentistry, since the loss of his thumb deprived him of the manual dexterity essential for that profession. In January, 1977 plaintiff obtained employment as a consultant in dentistry earning $25.00 per hour, but he could work only a limited number of hours each week, since the available consultation work was allotted on the basis of seniority.
To establish the measure of his damages sustained because of impaired earning capacity caused by defendant's fault, plaintiff presented evidence consisting of the estimated amount of earnings he would reasonably have been expected to receive from the date of the accident over the remainder of his working life if he had not been injured, *315 minus the estimated amount of earnings he had actually received since the accident and can reasonably expect in the future in the consulting work he is still able to perform despite his physical impairments. The evidence also presented various factors involved in adjusting that portion of the figures which are attributable to the period after the date of trial, since those figures are projections into the future.
Dr. John Chisholm, an expert in economics, presented his calculations on behalf of plaintiff. As a basis for calculating the amount of future earnings plaintiff would reasonably have been expected to receive in dentistry, the expert determined plaintiff's annual earnings in 1973, 1974, 1975 and 1976 (the 1976 figure was estimated for the year based on earnings through the date of the accident) and used a figure of slightly over $45,000 per year. As a basis for calculating the amount of future earnings plaintiff might reasonably expect to receive in consultation work, the expert used plaintiff's actual earnings in 1977, or $10,000. The expert then calculated that the difference in earnings projected through age 63.5 would be $765,093, and through age 69 would be $1,036,077.[1] Using these figures to estimate plaintiff's net economic loss over the remainder of his expected work life, the expert applied three factors which he considered appropriate for an accurate projection: (a) a 3% annual increase attributable to an increase in productivity;[2] (b) a 4% annual increase attributable to an increase in price levels;[3] and (c) a 7% discount, representing the appropriate factor to reduce the net economic loss figure (theoretically to be lost over a period of years in the future) to present value.[4] When the amounts attributable to these figures were added and subtracted, the adjusted estimate of net economic loss through age 63.5 was $716,908 and through age 69 was $970,165.[5]
Defendants also offered an expert in economics, Dr. Boudreaux, who presented his estimate of plaintiff's economic loss calculated by a similar method. Dr. Boudreaux *316 used $42,000 as the basic figure for annual earnings in dentistry (compared to Dr. Chisholm's use of $45,000). The expert, however, reduced the figure by 17% to $30,300, explaining that most dentists have an expense for employees of almost 17% and that plaintiff would have incurred this expense, except that his wife worked for him without salary.[6] Dr. Boudreaux reasoned that since the base figure of $42,000 was attributable to the efforts of both spouses, only 83% of the base figure was attributable to plaintiff's efforts.[7]
The second principal difference between this expert's calculations and those of Dr. Chisholm was Dr. Boudreaux assumed that only a 5% annual increase was appropriate and then only for the first ten years.[8] His 7.3% discount rate compared favorably to the 7% used by Dr. Chisholm.
The trial judge, in an excellent written opinion, evaluated in detail the evidence bearing on plaintiff's loss due to impaired earning capacity. The judge was most impressed with Dr. Chisholm's testimony, considering the factors used by that expert as the fairest method of calculation and rejecting Dr. Boudreaux's opinion on appropriateness of considering price increases and on the leveling off of a professional man's earning cycle.
Expressly taking into consideration all of the factors discussed by all three experts in economics, the trial judge awarded $800,000 for this item of damages. The court of appeal affirmed that award, but this court on original hearing set aside the award and remanded to the court of appeal to determine the proper award by subtracting from "the income of the couple" an amount attributable to the contributions of the wife, who was not injured in the accident and who "can continue to work in the future".
We erred in that portion of our decision on original hearing. When the trial court determined the amount of damages sustained by this tort victim, it was appropriate to consider all pertinent factors discussed by the experts as those factors bear on the probability of this victim's earnings over his work life expectancy.
Although most dentists employed dental assistants, this dentist did not, because his wife performed the services. The evidence clearly supported the probability that this method of operation would have continued during the remaining years of plaintiff's practice if his professional career had not been ended by defendants' fault.[9] Accordingly, we cannot say the trial judge erred in his apparent conclusion that this expense, which this dentist had not incurred *317 in the recent past, would likely not be incurred by this dentist in the future had he continued practicing.[10]
One of the appropriate factors to be considered in setting damages for impairment of earning capacity is the probability or improbability that plaintiff would have earned similar amounts during the remainder of his work life, but for the injury. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). While evidence of the wife's working without salary and of the employment practices of other dentists was relevant and appropriate for consideration, a rational trier of fact could conclude on the evidence in this record that this dentist, with his method of operation, would have earned similar amounts during the remainder of his work life. Moreover, impairment of earning capacity cannot be calculated with mathematical certainty, and sound judicial discretion must be exercised after all proper considerations are weighed. McFarland v. Illinois Cent. R. R., 241 La. 15, 127 So.2d 183 (1961).
In the present case the trial judge weighed all proper considerations and he may have concluded that plaintiff's expected remaining work life was beyond 63.5 or that the appropriate price increase factor was more than 4%. We cannot say on this remand that the judge's award for impairment of earning capacity constitutes an abuse of his "much discretion". C.C. art. 1934(3).
Defendants also attack on rehearing the trial court's rejection of its argument on mitigation of damages.
Invoking the doctrine of avoidable consequences, defendants contend that plaintiff had a duty to mitigate his loss by obtaining full-time employment outside his chosen field. Defendants argue that plaintiff limited himself to part-time employment in dental consultation only because he was receiving disability benefits from private insurance.
In the determination of an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity. Defendants were not restricted in their presentation of evidence (and argument) that plaintiff, with exceptional intelligence, could have entered the field of dental sales (in which successful salesmen earned more than many dentists), or could have been reeducated in another field, or could have gone into full-time real estate work.[11] Defendants were also allowed to establish that plaintiff was receiving disability insurance benefits. Nevertheless, the judge apparently concluded that plaintiff had acted reasonably by remaining in his chosen field and by working in the only capacity he was physically able to perform, for as many hours as consulting work was available.
On this record the trial court could properly have concluded that defendants failed to prove that other reasonable work opportunities were actually available to a person of plaintiff's education, training, experience and physical ability, or that plaintiff refused to take advantage of such opportunities. Indeed, the court expressly found that plaintiff showed strong motivation in continuing his professional career under adverse circumstances not of his own making. We conclude that the trial court did not err in finding that plaintiff acted reasonably and in good faith to minimize *318 the damages he sustained through defendants' fault.[12]
Attorney's Fees
On reconsideration we further conclude that we erred on original hearing in denying attorney's fees against the manufacturer.
The manufacturer of products introduced into commerce has the obligation to produce a product which is reasonably safe for its intended use. Weber v. Fidelity & Cas. Ins. Co., 259 La. 599, 250 So.2d 754 (1971). Breach of this obligation gives rise to a cause of action in favor of the purchaser of the product not only to demand the return of the purchase price, but also, because the manufacturer is presumed to know of defects in its products, to demand all damages caused by the defect and reasonable attorney's fees. C.C. art. 2545; Rey v. Cuccia, 298 So.2d 840 (La.1974).
In the present case on original hearing this court, noting that plaintiff had only demanded tort damages and had not demanded rescission, held that attorney's fees under C.C. art. 2545 were not recoverable.[13] That analysis represents a return to the requirement of pleading the theory of the case, which we reject on rehearing.
Our decision on rehearing also records with basic concepts of tort responsibility. While C.C. arts. 2315 and 2316 are the fountainhead of tort responsibility, the court which determines tort responsibility in a particular case must decide the applicable standard of conduct by consulting the many other codal articles, statutes and laws which provide for certain responsibilities according to the person involved or to the relationship or activities involved. Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133 (1971).
The appropriate standard of conduct in this case is derived from the codal articles on sales, since the cause of action of the purchaser of a defective thing may be enforced against both the seller and the manufacturer of a thing.[14]Media Production Consultants v. Mercedes-Benz of N. A., Inc., 262 La. 80, 262 So.2d 377 (1972). One of the obligations imposed on the seller (manufacturer) is the warranty against hidden defects of the thing sold. C.C. art. 2476. When the thing sold has a redhibitory defect, the seller (manufacturer) "who knew not of the vices of the thing" is only liable for the return of the price and the expenses of the sale. C.C. art. 2531. However, the seller (manufacturer) who knows of the vice of the thing and fails to warn is also answerable for damages and reasonable attorney's fees.[15] C.C. art. 2545.
*319 There is no compelling reason to require a person injured by a defective product he has purchased to proceed either in contract or in tort. The seller's (manufacturer's) act of delivering a defective thing, when he knows of the defect, gives rise to delictual, as well as contractual, liability. S. Letvenoff, Louisiana Civil Law TreatiseObligations, Book 2 § 252 (1975); see also W. Crawford, Products Liability The Cause of Action, 22 La.B.J. 239 (Mar. 1975).
We conclude that the right and the extent of recovery by the purchaser of a thing against the seller or manufacturer is governed by the codal articles providing for responsibility in the seller-purchaser relationship, as applied through C.C. art. 2315. Since C.C. art. 2545 clearly provides for recovery of damages caused by a defective product and for reasonable attorney's fees, we conclude the court of appeal correctly made such award. We further conclude that the amount of the court of appeal's award of attorney's fees ($25,000) did not constitute an abuse of discretion.

DECREE
The judgment of the court of appeal is affirmed. All costs are assessed to defendants.
DENNIS, J., concurs.
WATSON, J., concurs as to the issue of impairment of earning capacity but dissents from the award of attorney fees.
MARCUS and BLANCHE, JJ., dissent, adhering to opinion on original hearing.
NOTES
[1] According to a 1970 study by the U.S. Department of Labor of the length of working life of men and women, a man plaintiff's age (42) at the time of the accident had a work life expectancy of 21.5 years, while one at age 63 had an additional work life expectancy of 6.4 years. The expert conceded that the work life expectancy of professional men with no mandatory retirement age was less predictable and depended on the individual.
[2] The expert defined productivity as the measurement of the output of a person in goods and/or services over a given period of time. Statistics compiled by the U.S. Department of Labor revealed that productivity for all levels of work increased between 1950 and 1975 at an average annual rate of 2.7%. The expert attributed increases in productivity to individual improvements achieved through work experience and to technological improvements, reasoning that a 3% factor was appropriate for persons in professional occupations.
[3] Noting that price levels had increased annually since 1945, the expert reasoned that price level increases would continue over the pertinent period, giving rise to increases in earnings to defray increases in the cost of living (a consideration totally unrelated to productivity). The expert recommended the use of a 4% factor, but classified that figure as "very conservative", since the percentage increases in the four years prior to trial were 6.5, 4.8, 7 and 12.2%. The tables introduced at trial exhibited the expert's alternative calculations using a 6% and a 7% factor (the higher factors increasing the adjusted estimate of net economic loss).
[4] The expert opined that 7% was appropriate, being the current rate of return on a safe investment over a long term. He testified that he generally used a 5% or 6% factor (the higher the factor, the lower the figure representing the net economic loss at present value), but deemed 7% reasonable in this case, because plaintiff had some previous successful investment experience. The tables introduced at trial exhibited the expert's alternative calculations using a 6% factor.

We note that the expert applied the discount factor to the entire amount of estimated economic loss, even that attributable to the period of time between the accident and the trial, on which the discount factor is not usually applied in such calculations.
[5] Stated otherwise, a fund of $716,908, invested at 7% on February 21, 1976, would generate $35,000 annually, growing at a rate of 3% plus 4% per year, and the entire fund would be used up in 21.5 years. This fund thus represents the amount of money needed for investment to replace a net annual income loss of $35,000 over a 21.5-year period, with adjustments for annual increases in productivity and in prices for goods and services.
[6] We note that 17% of $42,000 is $7,140, whereas Dr. Boudreaux's 17% reduction from that figure amounted to $11,700.
[7] For three and one-half years prior to the accident plaintiff's wife served as his dental assistant and receptionist, and also helped with the bookkeeping, but did not draw a salary. During this period plaintiff had virtually no other expense for employees, but he did pay other assistants prior to his wife's working with him, and he conceded he would have had to hire someone else if she did not perform the services.
[8] Dr. Boudreaux used 5% as the estimated annual increase in earnings he would reasonably expect for a dentist during the ten years after trial, at which age he would expect the earnings of a professional to level off.

He did not consider an increase attributable to a rise in prices of goods and services, because he believed the upward trend in prices would be reflected both in income and expenses. (Dr. Chisholm had applied the inflation factor to the amount of income which exceeds expenses.)
Dr. Boudreaux's opinion that a dentist's earnings should be expected to level off as he reaches the mid-50's was vigorously rebutted by Dr. House, the senior economist for the American Dental Association. Dr. House also testified that 68 was the median age through which dentists could be expected to continue their practice. He also opined that anticipated increases in the prices of goods and services should be included in time series studies.
[9] The evidence overwhelmingly established that the happily married parents of six children were extremely satisfied in this relationship, in which they shared the husband's love and devotion to dentistry, and that they looked forward to sharing this relationship on a permanent basis. It is therefore more probable than not that this dentist in the future would not have incurred the usual expense of an employee's salary.
[10] Plaintiff argues persuasively in this court that if plaintiff's wife owned as her separate property the office in which he practiced and if she had contributed the building without rent in the past and was likely to do so throughout his professional career, it would be inappropriate in calculating plaintiff's expected future earnings to deduct arbitrarily an expense item for rent (which plaintiff had never incurred and was unlikely to incur in the future) simply because other dentists generally incurred this expense.
[11] Plaintiff had invested to some extent in real estate while practicing full-time dentistry.
[12] The doctrine of avoidable consequences bars recovery of those damages which occurred after the initial injury and which might have been averted by reasonable conduct on the part of the plaintiff. W. Prosser, Law of Torts § 65 at 422 (4th ed. 1971). The standard is that of a reasonable man under like circumstances.
[13] This holding apparently limited recovery of attorney's fees, in cases in which the plaintiff demands both return of the purchase price and damages against the bad faith seller or manufacturer, to those fees attributable to recovering the purchase price. Plaintiff's failure in the present case to demand return of the purchase price (to which he was clearly entitled) certainly would not defeat his entitlement to attorney's fees for recovering damages, if he were otherwise entitled to such fees.
[14] The approach of allowing recovery against the manufacturer upon proof that the product was defective (unreasonably dangerous to normal use) and that the injury was caused by the defect is the functional equivalent of the common law's strict liability in tort. D. Robertson, Manufacturer's Liability for Defective Products in Louisiana Law, 50 Tul.L.Rev. 50, 57 (1975). Liability is strict in the sense that proof of knowledge of the defect is not required. The manufacturer's "fault" is the creation of an unreasonable risk of injury by placing the product in commerce.
[15] The long-standing jurisprudence of this state imputes knowledge of defects in a product to the manufacturer of the product. See, for example, Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906 (1911). The Weber case extended the presumption of knowledge of a defect to cases in which the defect caused personal injuries.

The primary purpose of the presumption, of course, is to prevent a manufacturer from placing into the stream of commerce a thing which is not reasonably safe for its intended use. Another consideration is the public policy of placing the burden of accidental injuries caused by products upon those who market the products and can treat the cost of insuring against these injuries as a cost of production. Restatement (Second) of Torts § 402 A, comment c.