709 So.2d 941 (1998)
Murphy R. WALTON
v.
COOPER/T. SMITH STEVEDORING.
No. 97-CA-0100.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1998.
As Clarified on Rehearing March 25, 1998.
*942 Charles F. Lozes, L.R. DeBuys, IV, Terriberry, Carroll & Yancey, L.L.P., New Orleans, for Appellant Singapore Shipping Corporation (Pte.), Ltd.
Thomas M. Discon, John G. Discon, Gregory T. Discon, Discon Law Firm, Mandeville, for Appellee.
Timothy F. Burr, J. Michael Grimley, Jr., Galloway, Johnson, Tompkins & Burr, P.L.C., New Orleans, for Appellants Cooper/T. Smith Stevedoring Company, Inc.
Before SCHOTT, C.J., and LOBRANO and WALTZER, JJ.
*943 LOBRANO, Judge.
This is a maritime case brought in state court pursuant to the "Savings to Suitors" clause. Plaintiff, Murphy Walton, obtained a judgment against his employer, Cooper/T.Smith Stevedoring, Inc. (C/TS) and Singapore Shipping Corporation PTE., LTD (Singapore), the vessel owner, for injuries he sustained while departing Singapore's ship without the use of a gangway. C/TS and Singapore appeal and plaintiff answered the appeal. The facts precipitating this lawsuit are as follows:
Plaintiff began employment with C/TS sometime in 1973. For approximately 12 to 14 years prior to his accident of March 20, 1992, plaintiff was employed as a crane operator. In that capacity, plaintiff was assigned to derrick barges owned by C/TS which would moor alongside a ship to perform loading or unloading operations. Beginning March 18, 1992, C/TS had the job of loading petroleum coke onto the M/V ATHOL, a Liberian registered freighter. This operation took place at the Chalmette Slip in St. Bernard Parish where the ATHOL was docked. C/TS's customer was Kaiser Aluminum, and Singapore was the owner pro hac vice of the ATHOL. In order to accomplish this task, C/TS moored its derrick barge, the "Mr. Burt", starboard side to the ATHOL. The ATHOL was moored starboard side to the dock.
The evidence shows that the loading operations were to commence at 6:00 p.m. on March 18th. However, due to inclement weather, the operations did not begin until the morning of the 19th. Plaintiff was the crane operator on the "Mr. Burt". His immediate supervisor was the derrick foreman, Ralph Perkins. Perkins would receive his orders from the ship superintendent, Jim Panarello, who would oversee the entire operation. Panarello was stationed on the ATHOL and was in communication with Perkins via hand-held radio. The "Mr. Burt" had a derrick crew who worked the deck of the derrick barge. In addition, four longshoremen were assigned to work the coke barges as they were moored alongside the "Mr. Burt".
The operations commenced on the morning of the 19th. Panarello boarded the ATHOL at approximately 6:15 a.m. The operations proceeded without incident, other than the delayed start, and continued until plaintiff began experiencing "swing" problems with the crane's boom. Apparently, electrical difficulties prevented plaintiff from controlling the swing of the boom causing its bucket to collide with the ship. Operations were shut down three or four times during the day and into the morning hours of the 20th because of this problem. The evidence suggests the problem would be temporarily fixed, but then it would reoccur.
At approximately 10:15 on the morning of March 20th, Perkins received word from Panarello that the operations were complete and that tugs had been called to move the "Mr. Burt" away from the ATHOL. The evidence supports that there was another ship waiting to move to the ATHOL's berth and that its loading operations were behind schedule because of the delay in loading the ATHOL.
Once Perkins received word from Panarello, he ordered the placement of the hatch covers on the barges. The longshoremen were then sent ashore. They crossed the "Mr. Burt", went up a ladder on the side of the ATHOL, crossed the ATHOL's deck, "punched out" with Panarello, then exited the ATHOL via a gangway. A short while later, plaintiff went up the same ladder to the ATHOL's deck for the purpose of removing the ladder and releasing the mooring lines on the "Mr. Burt". This is normal procedure for one member of the derrick crew to board the ship and release the derrick barge's mooring lines.
Plaintiff had difficulty removing the stern line of the "Mr. Burt" because the lengthy reach of the cable made it too heavy to lift over the mooring bit. Plaintiff sought help from one of the ATHOL's crew members but was unsuccessful. He walked towards the bow and hollered down at Perkins about the problem. Perkins told him to release the spring lines which plaintiff did, and then he proceeded towards the stern again. When he reached the stern he realized that someone from the ATHOL had already released *944 "Mr. Burt's" forward cable and that its bow was moving away from the ship. Plaintiff described it as being at a 45° angle to the ship. With the help of the towboat "Okaloosa", plaintiff then managed to release the stern line. Plaintiff then started walking towards the bow again when he ran into a seaman who was carrying a hand-held radio walking towards him. A crew member of the "Mr. Burt", Jimmy Guillot, hollered to plaintiff that someone from the ATHOL had already released the bow lines so plaintiff proceeded to walk across the ship, near No. 5 hatch, towards the gangway.
When plaintiff reached the starboard side of the ATHOL, the gangway had already been removed and secured to the ship. Plaintiff testified that the ship's crew member, in broken English, yelled at him "no gangway, no gangway" and indicated that the ship was getting ready to leave. Realizing that the main gangway had been secured, plaintiff asked for what is termed a "sliding gangway".[1] Seeing none, and fearful that the ship was pulling away from the dock, he climbed outboard of the railing and stepped off on to the wharf. He described the distance as about two feet out and two feet down. His right foot reached the stringer on the wharves's edge, and when his left foot came down, it slipped on the stringer injuring his ankle.
As a result of the physical injuries to his ankle, plaintiff developed emotional and psychiatric problems. This lawsuit resulted. Plaintiff sued his employer pursuant to the Jones Act and the vessel owner[2] for negligence under the general maritime law. Each defendant denied any fault on its part, and alternatively asserted plaintiff's own comparative negligence. C/TS sought indemnity from Singapore based on a document entitled "Boarding Certificate" which was provided to the mate of the ATHOL prior to commencement of work.
The matter was tried before a judge who found each defendant 50% responsible for plaintiff's injuries, and awarded him $1,343,887.00 in damages. In addition, the court rendered judgment in favor of C/TS on its claim for indemnification. However, citing Watterson v. Mallard Bay Drilling, Inc., 93-1494 (La.App. 3 Cir. 10/12/94), 649 So.2d 431, writ den. 94-2769 (La.1/27/95), 650 So.2d 241, cert. denied, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995) the court refused to consider plaintiff's comparative negligence for the reason that both defendants violated either OSHA or Coast Guard regulations. The court awarded interest from the date of the injury as to Singapore and, as to C/TS, from the date the petition was filed. Interest on the future components of the damages were awarded from the date of trial.
In a well reasoned opinion, the trial judge concluded that plaintiff was the last C/TS employee to leave the ATHOL and that Panarello, the ship's superintendent, had left before him. The judge further reasoned that plaintiff was hastened in his attempt to disembark, that he requested and was refused a gangplank and that, at the time, the ATHOL's crew appeared to be in a hostile mood. The court held C/TS responsible for failing to provide plaintiff a safe place to work and proper or adequate equipment, as well as failing to properly instruct plaintiff "for the circumstances plaintiff faced on the day of the accident". Singapore was held liable for failure to provide plaintiff with safe egress from the ATHOL and failing to exercise reasonable care to protect plaintiff under the circumstances presented on the day of the accident. In supplemental reasons, the court clarified, to an extent, that C/TS had violated certain unspecified OSHA regulations which precluded the necessity of determining plaintiff's fault. The court also concluded Singapore violated certain unspecified Coast Guard Regulations, and for the same *945 reason, plaintiff's fault was not considered as to it.
C/TS and Singapore perfect this appeal. Each argues that the court erred in finding it at fault, in failing to consider plaintiff's contributory negligence, in computing and awarding loss of future medical benefits and in awarding pre-judgment interest on the Jones Act claim against C/TS. Separately, Singapore raises as error the court's finding that it must indemnify C/TS. C/TS argues that the court erred in not considering plaintiff's failure to mitigate his damages and in its computation of loss of past and future wages. Plaintiff answered the appeal asserting that the trial court should have determined his fault, if any, with respect to Singapore's liability.
For the following reasons, we reverse in part, affirm in part and remand.

NEGLIGENCE OF C/TS:
It is undisputed that plaintiff is a Jones Act seaman. The recent U.S. Fifth Circuit case of Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997), settled previous jurisprudence with respect to the duty of care owed by both the employer and employee-seaman in a Jones Act case. Simply, the employer and employee are each obligated to act according to the reasonable person standard. The duty owed by each is to act with ordinary reasonable prudence under a given set of circumstances. Thus, the prior distinction between an employer's "slightest negligence" as opposed to the seaman's "gross negligence" is no longer viable. We are persuaded by the Gautreaux decision.
The Jones Act employer owes his employee-seaman the duty to provide a safe working area and proper equipment. Colburn v. Bunge Towing, Inc., 883 F.2d 372 (5th Cir.1989). C/TS argues that the duty to provide a safe work place does not include the duty to provide egress from a vessel over which it has no control and which is owned by a third party. C/TS relies on Duplechain v. Garber Brothers, Inc., 486 So.2d 917 (La. App. 1st Cir.1986). While the facts in Duplechain make clear that plaintiff's employer had no control over the premises where plaintiff was injured, the opinion fails to disclose whether the path plaintiff chose to traverse was required by his employment or anticipated by his employer. Those factors are present in the instant case and, in our opinion, distinguish it from Duplechain.
In this case, the evidence is overwhelming that C/TS knew someone from the "Mr. Burt" would board the ATHOL to release "Mr. Burt's" mooring lines. Both Ralph Perkins and Jim Panarello testified that was normal procedure. Thus, C/TS knew that whoever from the "Mr. Burt" performed those tasks had to reach shore via the ATHOL.[3] Panarello testified that it was his responsibility to see that all C/TS personnel were safely off the ship, and that normally he was the last to leave. The trial court found that Panarello left before plaintiff. The evidence supports that finding.[4] And, it is undisputed that when Panarello left, the gangway had been removed. Panarello testified he jumped from the ship to the dock.
When plaintiff completed releasing the lines to the "Mr. Burt", he looked for the gangway to leave the ATHOL. There was none. Plaintiff testified that a crew member shouted "ship leaving, no gangway". The evidence preponderates that the ship was in haste,[5] and that the crew was disturbed about the damage caused by the loading operations. Plaintiff made the decision to *946 step off the ship without the gangplank and was injured.
We hold that C/TS had a duty to ensure that all of its personnel, including plaintiff, were safely ashore after the loading operations were completed and that it breached that duty. It was certainly foreseeable that someone from the "Mr. Burt" would be on the ATHOL and would, of necessity, have to reach shore via the ATHOL's gangway. Given that scenario, C/TS should have ensured that person's safe exit from the ship.
C/TS argues, however, it was the ship's responsibility to provide a gangway and not theirs. This argument ignores the issue. Certainly the ATHOL has responsibility for providing a gangway (an issue we discuss infra); however this does not negate C/TS's duty. Specifically, Panarello testified that throughout the operations, part of his responsibility was to make sure the ship provided a safe means of ingress and egress for C/TS personnel. Once Panarello left the ship, there was no C/TS supervisor to enforce this requirement. Thus, the breach of that duty by C/TS is not simply in failing to put out a gangway, but to make sure all of its personnel were safely ashore.[6]
C/TS further argues that it was not foreseeable that the ATHOL would refuse plaintiff a gangway and thus, without notice of the condition and the opportunity to correct it, it cannot be negligent. The evidence refutes this argument.
Panarello knew there was no gangway. He had to jump ashore. It would be a reasonable assumption on his part that if the ATHOL did not put out a gangway for him, it would not be provided for any other C/TS employee. Panarello did not check to see if all C/TS personnel were ashore even though he knew someone from the "Mr. Burt" had to release her lines and go ashore via the ATHOL. Given those circumstances, C/TS can hardly argue that it had no knowledge of the condition or the fact that one of its personnel would be left on board.
We cannot find any clear error by the trial judge in finding C/TS negligent and thus we affirm that finding.

SINGAPORE'S NEGLIGENCE:
The trial court found Singapore liable for failing to provide plaintiff safe egress from the ATHOL and failing to exercise reasonable care to protect him under the circumstances. Singapore argues that the retraction of its gangway was reasonable because Panarello, the ship's superintendent, had advised that the operations were complete. The tugs were on location, the pilot was on board and the ship was ready for departure. Under those circumstances, asserts Singapore, there was no reason for it to believe the gangway would be needed anymore. Furthermore, Singapore says that plaintiff failed to request a gangway and merely proceeded to disembark without one on his own. Without knowledge, there can be no negligence, concludes Singapore.
It is not disputed that the general maritime law imposes on a vessel owner a duty to provide a reasonably safe means of access for those boarding or leaving the vessel. Moore v. Phillips Petroleum Co., 912 F.2d 789 (5th Cir.1990) at 792. Further, ATHOL's captain testified that a gangway is required at all times the ship was at the dock. He further acknowledged that if a gangway was requested by a C/TS employee, the crew was required to provide one and/or notify him. In addition, the evidence shows that, as a routine matter, every ship worked by C/TS furnishes gangways for the use of C/TS employees. The issue in this case narrows to whether plaintiff requested a gangway and/or whether Singapore had sufficient knowledge of plaintiff's predicament as to impute to it the necessity of furnishing a gangway.
Plaintiff testified that he asked the crew member who was telling him "no gangway" where was the "slide gangway". That would have been the logical gangway to use since the combination gangway had been retracted and secured. The only response he received was "no gangway". Singapore argues that *947 this person was not an officer and that plaintiff made no further efforts to break the language barrier; i.e. seek help from another member of the ship's crew.
The evidence supports the fact that the crew member with whom plaintiff spoke was in fact a mate (either chief mate or second mate). Plaintiff testified that this individual had a radio and was the same person he met on the port side of the ship when he was releasing the mooring lines to the "Mr. Burt". ATHOL's captain testified that at departure time, the only two crew members on deck with radios are the chief mate and second mate. Thus, it is more likely than not that plaintiff's request was directed to a crew member who had the authority to act, either by providing a gangway or relaying the request to the bridge. Failure to heed plaintiff's request under those circumstances constitutes negligence by the crew which is imputed to the vessel owner. For that reason we find no error in the trial court's decision to impose 50% of the responsibility on Singapore.

PLAINTIFF'S COMPARATIVE NEGLIGENCE:
Relying on Watterson v. Mallard Bay Drilling, Inc., supra, the trial court, as a matter of law, refused to consider plaintiff's own fault finding that OSHA was violated and thus 45 U.S.C. Sec. 53 precluded a finding of contributory negligence. In Watterson the court found that the Jones Act employer was subject to OSHA, rather than Coast Guard, regulations and thus a violation of those regulations resulted in negligence per se which precluded consideration of plaintiff's own negligence. C/TS argues OSHA is not applicable in this case because plaintiff is a member of a crew of a vessel, and thus plaintiff's contributory negligence should have been considered. In support, C/TS cites 29 C.F.R. §§ 1918.1(b) and 1918.3(d).
Plaintiff acknowledges that because Singapore is not his Jones Act employer, 45 U.S.C. Sec. 53 is not applicable to the ATHOL, and thus, vis a vis Singapore, a finding by the trial court with respect to his own negligence should have been made. Plaintiff's acknowledgement is correct. Thus, because we must consider plaintiff's contributory negligence, and because we find none, we pretermit the issue of whether OSHA is applicable to C/TS under the facts of this case.
Both C/TS and Singapore argue that plaintiff had numerous alternatives he could have taken in lieu of stepping off the ship.[7] However, the presence of alternatives does not necessarily mean the actions taken by plaintiff were negligent.
It is undisputed that plaintiff saw no danger in stepping off the ship at that particular location. He believed it was safe to do so and there is no showing in the record that his belief was not warranted. Indeed, Panarello had safely done so a short time before, although plaintiff did not know that. The evidence supports the conclusion that, other than asking for a gangway, C/TS had no set procedure or instructions for employees faced with plaintiff's situation. C/TS and Singapore argue that C/TS had instructed its employees always to use a gangway. However, the evidence preponderates that that rule was never enforced. In fact, Perkins and the other derrick crew members all testified that they would have done the same as plaintiff under those circumstances. Panarello did in fact leave without a gangway. It was not unusual for C/TS personnel to exit a ship without using a gangway even when one was provided.[8]
Gautreaux v. Scurlock, supra, provides:
"A seaman, then, is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training and education. The reasonable person standard therefore, and [sic] a Jones Act negligence action *948 becomes one of the reasonable seaman in like circumstances." (emphasis ours) [id.] at p. 339.
Applying that standard to the instant case we hold that plaintiff did what a reasonable seaman (i.e. C/TS derrick crew member) would have done under the same circumstances,[9] and that his actions were not foreseeably unsafe.
Furthermore, although suggesting alternatives, C/TS and Singapore failed to prove that plaintiff was aware of those alternatives or that he was instructed on which to take. In fact, the evidence strongly suggests that given the circumstances plaintiff faced, the actions he took seemed to be the most viable at the time. Plaintiff testified he had never faced that situation before, and there is no evidence to suggest that any other C/TS employee had ever encountered that situation. We hold that C/TS and Singapore did not prove that plaintiff's course of action was unreasonable or a deviation from the seaman's standard of care for his own safety.
For those reasons, we find no contributory negligence by plaintiff.

FUTURE MEDICAL BENEFITS:
Singapore and C/TS both argue that the trial judge erred in awarding as damages the value of future medical insurance benefits. Included in plaintiff's total award was an award of $148,140.00 for "projected future hospitalization benefits lost." Defendants argue that the only evidence offered by plaintiff regarding this claim was the Derrick Agreement of General Longshore Workers, Local Union No. 3000 and C/TS, and the testimony of plaintiff's economist, Melville Wolfson.
The portion of the derrick agreement which refers to medical insurance benefits states as follows:
The annual deductible for comprehensive medical payments is $250 per person, with a maximum out-of-pocket expense of $1,250 per person annually.
Dr. Wolfson testified as to the future cost of maintaining medical insurance for plaintiff and his family. Defendants contend that this evidence does not support an award for the value of future medical insurance benefits.
Defendants are incorrect in their assertion that plaintiff did not offer other evidence to support his claim for future hospitalization benefits. In addition to the above-mentioned evidence, plaintiff also testified, in detail, about the type of hospitalization coverage he had while working at C/TS, the subsequent loss of this coverage, and the cost to him of obtaining a similar major medical policy.
Specifically, plaintiff testified that when he had group health insurance which was furnished in accordance with the derrick agreement, the policy covered his family with a $250 deductible for each family member. His benefits package covered the premiums for this policy. After the deductible for a family member was met, plaintiff paid 20% of the first $5,000 in medical expenses and the insurer paid 100% of any expenses over that amount. Additionally, for emergency medical treatment, the insurer would pay 100% of expenses after a family member's deductible was met.
Plaintiff further testified that he received a letter in February, 1994, from C/TS informing him that his hospitalization policy had been cancelled as of January, 1994. This letter also informed him that a COBRA plan was available to plaintiff at a cost of over $500 per month. Because the COBRA plan cost more than plaintiff could afford, he contacted Blue Cross/Blue Shield directly in an effort to obtain a medical insurance policy for his family within his means.
The benefits package under the derrick agreement provided plaintiff and his family with a comprehensive group medical benefits policy with Blue Cross/Blue Shield which included coverage for major medical benefits as well as dental care and eyeglasses coverage. However, the individual Blue Cross/ Blue Shield policy which plaintiff obtained provides less benefits and greater out-of-pocket *949 cost. This policy was what plaintiff was able to obtain based on what he can afford. Under the new policy, plaintiff pays a monthly premium of $350 and a $1,000 deductible for each family member. After a family member's deductible is met, plaintiff pays 30% of the first $5,000 in medical expenses and the insurer pays 100% over that amount. The new policy includes only major medical benefits and does not provide coverage for dental care and eyeglasses.
Dr. Wolfson provided calculations as to the future cost to plaintiff of maintaining medical insurance which was comparable to the insurance he received under the derrick agreement. Dr. Wolfson based these calculations on several factors including plaintiff's testimony which compared his former insurance coverage with his current coverage and his out-of-pocket costs for each, his former union contract which outlined the costs paid by members for hospitalization coverage and a Blue Cross/Blue Shield of Louisiana Rate Schedule. Using these figures and United States Department of Labor statistics, Dr. Wolfson projected that to provide medical insurance for plaintiff and his wife until age 65 and for their two children until age 22 would cost plaintiff $148,140.00.
Furthermore, plaintiff's vocational rehabilitation counselor, Tom Stewart, testified that plaintiff is limited to unskilled/sedentary work. His estimate of plaintiff's median range of income over his foreseeable work life is $5.25 per hour. Stewart's testified that, in his experience, he has found that health insurance benefits are almost non-existent for those types of jobs.
The trial judge accepted Dr. Wolfson's projections and awarded plaintiff $148,140.00 in future lost hospitalization benefits. Given the testimony of plaintiff, Wolfson and Stewart, we find that this award was appropriate and supported by the record.

EXCESSIVE PAST AND FUTURE WAGES:
Defendant C/TS next argues that the trial court's award for past and future lost wages was excessive. The trial judge awarded plaintiff past lost wages of $179,819.00 and future lost wages of $700,000.00. In arriving at these figures, the trial judge relied, to an extent, on the figures and projections of Dr. Wolfson. The judge noted that Dr. Wolfson testified to a $782,496.00 future wage loss with credit for a $6.00 per hour wage earning capacity using $70,000.00 as an annual base. Because the judge felt that the base should be closer to $67,000.00, he adjusted the projected future after tax loss downward to the $700,000.00 figure.
Defendant argues that the minimum level of work restrictions that should have been accepted by the trial judge was the level of physical restrictions involved in plaintiff's job that he was performing at the time of the trial.[10] Defendant concedes that plaintiff's treating physician, Dr. Steven Zichichi, testified that plaintiff should be limited to sedentary work, but it suggests that at the time of trial, plaintiff was performing work which could more properly be described as light duty.
Plaintiff and C/TS retained different vocational rehabilitation counselors and economists to evaluate plaintiff's wage earning capacity since the accident. Plaintiff's vocational rehabilitation counselor was Tom Stewart and his economist was Dr. Melville Wolfson. Stewart made an employability assessment and determined that plaintiff is physically capable of sedentary work only. He also stated that plaintiff will be limited to unskilled jobs due to his low level of academic functioning and other factors. His opinion is that vocational retraining is not a viable option for plaintiff. Stewart stated that plaintiff's median level of income in the foreseeable future will be approximately $5.25 per hour. He disagreed with the higher wage projections of defendant's vocational rehabilitation counselor because his opinion is that plaintiff does not have the type of skills required to perform sedentary jobs which offer these higher wages.
Larry Stokes, a vocational rehabilitation counselor, was retained by C/TS to conduct a *950 labor market survey to determine the types of jobs available to a worker with light duty physical restrictions and the wages offered for those jobs. His initial labor market research identified light duty jobs which paid between $9.00 and $10.00 per hour. He also identified several jobs available at C/TS in the sedentary-to-light duty category which, in his opinion, plaintiff could have performed after the accident. According to Stokes, these jobs pay approximately $35,000.00 annually and include health insurance and other benefits. Dr. Kenneth Boudreaux, defendant's economist, used the figures provided by Stokes in calculating his projection of plaintiff's lost wages. Defendant argues that the trial judge should have accepted the testimony of Stokes and Boudreaux and calculated plaintiff's awards for past and future lost wages based on the higher wage figures which Stokes found that plaintiff was capable of earning.
The trial judge chose to accept the testimony of plaintiff's experts and reject that of defendant's experts. Based on our review, we find no clear error in that determination.

MITIGATION:
C/TS also argues that the trial court erred in concluding that mitigation of damages issues were inappropriate because plaintiff had experienced a temporary total disability due to his psychiatric problems. Defendant argues that the trial court's finding that the plaintiff had significant psychiatric problems ignores the fact that those problems were created by his choosing not to return to the work place after his accident. Defendant argues that the plaintiff's own psychiatrist, Dr. Walter Sanders, stated that if the plaintiff had returned to work after being released to work by his various physicians, he more likely than not would not have required psychiatric treatment.
In arguing that it is entitled to a reduction of the damage award, defendant cites Philippe v. Browning Arms Company, 395 So.2d 310 (La.1980), in which the Louisiana Supreme Court noted:
The doctrine of avoidable consequences bars recovery of those damages which occurred after the initial injury and which might have been averted by reasonable conduct on the part of the plaintiff. W. Prosser, Law of Torts § 65 at 442 (4th ed. 1971). The standard is that of a reasonable man under like circumstances.
The burden of proof is on the defendant to show to what extent plaintiff's damages should have been mitigated and the rule of mitigation of damages is to be applied with extreme caution. Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700.
On cross-examination, the following exchange occurred between defense counsel and Dr. Sanders:
Q. Let me ask you your opinion today. If he had, in fact, after being released by Dr. Zichichi, returned to work with Cooper/T. Smith within the restrictions that Dr. Zichichi put on him and he was earning about the same amount that he was earning before on an hourly basis That is, $17.50 an hour or perhaps more, full benefits Do you have an opinion one way or another as to whether or not he would have eventually needed psychiatric care?
A. May not have. He may have done well.
Q. Okay. Given those set of assumptions, if he had taken advantage of that kind of work, assuming they were within his physical restrictions assigned by the orthopedist or podiatrist, and they paid 17.50 an hour and he got to work forty hours a week and he got all of the same benefits that he had before, it's your opinion that in all likelihood it's more likely than not that he would not have needed psychiatric care, based on the history that he gave you when you first saw him, correct?
* * * * * *
A. It's a hypothetical question?
Q. It's a hypothetical question.
A. Yes. He might likely may not have needed psychiatric treatment if he returned to work.
Q. More likely than not he would not, correct?
A. That's correct.
*951 However, under redirect examination by plaintiff's counsel, the following exchange also occurred with Dr. Sanders:
Q. Doctor, let me ask you this: If at the time that a release to return to work occurred while he was under treatment, even before his first surgery, okay? Would that in any way Would you understand that the man would not be able to return to work or would not go to work at that time?
A. Actually, the whole concept of him returning to the company where he worked when he's had a serious injury that he can't do his primary job, to me, is really unbelievable. Like I said, there's a factor What kind of guarantee for the future does he have? Also, I have encountered situations where an attempt was made to do something like that, like the Sheriff's Office, for example, in Jefferson Parish. The person who returned to work and was still having surgery and they were being given all kinds of concessions are made to try to help them. They get a lot of peer disapproval. They start feeling isolated. It has a real bad psychological effect on them. I don't really recall ever seeing, certainly, in my career that a patient who was severely injured would go back to work at a company in a lesser status and be guaranteed of all these things.
Obviously, Dr. Sanders' initial response was qualified to a great extent by his testimony on redirect. He opined that returning to work with the same employer after an accident at reduced capacity can cause psychological problems. A reading of his testimony in its totality does not support C/TS interpretation of his response to the hypothetical question. To the contrary, Dr. Sanders suggested that returning to work in a reduced capacity with C/TS could have been psychologically detrimental to plaintiff.
Furthermore the trial judge reasoned:
Dr. Wolfson testified to a $782,496.00 future wage loss with credit for a $6.00 per hour wage earning capacity using $70,000.00 as an annual base. The court felt the base should be closer to $67,000.00 based [on] the evidence and accordingly adjusted the projected future after tax loss downward to the $700,000.00 figure.
Thus it is evident that Dr. Wolfson's computations took into account that plaintiff had a future earning capacity of $6.00 per hour. When the trial judge corrected the plaintiff's annual base to $67,000.00 and adjusted the projected future loss downward accordingly, the $6.00 per hour earning capacity credit used by Dr. Wolfson in his calculations was included. Therefore, to the extent of his $6.00 per hour earning capacity, the trial judge did mitigate the plaintiff's award for future lost wages.
Defendant further argues that plaintiff was treated by various physicians and released to work in May, 1993. In its effort to prove that plaintiff failed to mitigate his damages by returning to work, defendant focuses on the fact that plaintiff, through his attorney, was offered light duty work at C/TS. Plaintiff failed to respond to C/TS's letter of October 16, 1992 advising of the availability of work. Plaintiff counters with his inability to perform light duty work at that time. The evidence supports plaintiff's position.
Although Dr. Shaivi had released plaintiff for light duty work in mid-September, 1992, plaintiff was under the care of Dr. Zichichi from the latter part of September, 1992 through June, 1993. Our interpretation of Dr. Zichichi's testimony is that, at best, plaintiff was capable of performing only sedentary work during that period and after his release from Dr. Zichichi's care. Dr. Zichichi described sedentary work as that involving only sitting in a chair at a desk. He specified that plaintiff should not work at a job that required a lot of standing, walking, climbing, carrying objects or walking on uneven surfaces.
The job offered to plaintiff by C/TS in October, 1992, i.e. taking inventory in their New Orleans facility, was described in the letter as light duty. There was no description of what types of physical activity that job entailed. C/TS did not offer any evidence to show that plaintiff was offered and did not accept a job that he could perform. Without such evidence, we find that the defendant did not carry its burden of proving that plaintiff failed to mitigate his damages.

*952 INDEMNIFICATION:

The trial court ruled that Singapore must indemnify C/TS for all amounts C/TS is required to pay to plaintiff. The basis of that ruling was the court's conclusion that "Singapore breached its agreement with C/TS to provide and maintain a gangway at all times C/TS employees were on board the ATHOL". For the following reasons, we reverse that ruling.
The agreement the trial court alludes to is what Panarello described as a "Boarding Certificate" although Singapore, in brief, calls it an accident prevention form. Panarello testified that prior to beginning any operation, C/TS's ship's superintendent had to present to the mate of the vessel, a form which provides, in pertinent part, as follows:

ACCIDENT PREVENTION

10 February, 1984[11]
TO: MASTERS AND CHIEF OFFICERS OF VESSELS LOADING OR DISCHARGING IN NEW ORLEANS AREA
IN ORDER TO PREVENT UNNECESSARY ACCIDENTS TO LONGSHOREMEN AND PERSONS CONDUCTING BUSINESS ON BEHALF OF COOPER/T. SMITH STEVEDORING, YOUR ATTENTION IS DRAWN TO THE FOLLOWING, WHICH ARE THE RESPONSIBILITIES OF YOUR VESSEL.

1. GANGWAYS
Gangways must be properly attended at all times. Safety nets must be fitted and efficiently secured; gangway falls must be suitably adjusted during vessel's rise and fall during loading/discharging.
Gangway to be free from grease and other commodities which would cause persons to slip. During the hours of darkness, gangways must be suitably illuminated.

* * * * * *
At the end of the document is a signature line which is preceded by the word "Received". The document is signed by a representative, presumably the mate, of the ATHOL, and is dated March 19, 1992.
We agree with Singapore's initial argument that this document in no way can be interpreted to be an indemnity agreement. It is well established that, under either Louisiana law or Federal maritime law, indemnity agreements which require indemnification for an indemnitee's own negligence must be clear and unequivocal. Randall v. Chevron U.S.A., Inc., 13 F.3d 888 (5th Cir.1994), opinion modified, 22 F.3d 568 (5th Cir.1994). The document relied on by C/TS and the trial court doesn't even mention indemnity.
C/TS argues, however, that the boarding certificate/accident prevention form was a contract between it and Singapore and that Singapore breached the contract and thus C/TS is entitled to damages. We disagree. The document is not a contract. Its plain language says that it is an acknowledgement by the ship of its responsibilities, including maintaining a gangway. It does not provide consideration by C/TS for Singapore performing any obligation; there is no civil law "causa" or common law consideration. There is not even an agreement by the ship to carry out its responsibilities, only an acknowledgement that it has those responsibilities. And, finally, the ATHOL, by law had the duty to provide the gangway anyway. See, Thomas v. Jones, 353 So.2d 301, (La.App. 1st Cir. 1977), writ denied, 354 So.2d 1382 (La.1978).
We hold that the court erred in ordering indemnification by Singapore since the instrument relied on neither provides for indemnification nor is it a contract.

PREJUDGMENT INTEREST:
C/TS argues that the trial court erred in awarding plaintiff prejudgment interest on his Jones Act recovery. As to the judgment against C/TS the court awarded interest on all damages prior to trial from the date of *953 the filing of the petition, and from date of trial as to all components of future damages.
There appears to be confusion with respect to whether prejudgment interest in Jones Act cases is permissible. Both C/TS and Singapore[12] cite Colburn v. Bunge Towing, Inc., supra, for the proposition that "... under the Jones Act recovery of prejudgment interest is not permitted". at 378. Yet, the Louisiana Supreme Court, in Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, held that a Jones Act claim, tried to a judge, permitted pre-judgment interest at the discretion of the court. However, the court further concluded that prejudgment interest was not permitted on future damages. Following the Milstead decision, we reverse that portion of the judgment awarding prejudgment interest on all components of future damages. The trial court's reasons set forth, with particularity, the future special damages; however, general damages are not apportioned and therefore a remand is necessary for that purpose.

DECREE:
For the reasons assigned we reverse the trial court's award of indemnification by Singapore to C/TS; we remand to the trial court for an apportionment of the $250,000.00 general damage award into past and future components, for the calculation of prejudgment interest as to all past losses, and for the calculation of post judgment interest as to all losses, past and future. In all other respects, the judgment is affirmed.
REVERSED IN PART; AFFIRMED IN PART; REMANDED.
NOTES
[1] The main gangway, referred to in brief as the combination gangway, can be characterized as the ship's permanent gangway. It has steps, rails etc. which would lead from the dock to the vessel. The slide gangway could be classified as a temporary gangway that is utilized when the combination gangway could not reach the dock because of height differentials, normally the result of loading or unloading cargo.
[2] It is uncontested that Singapore is the owner pro hac vice of the ATHOL.
[3] In addition to releasing the mooring lines, the ladder used to reach the ATHOL's deck had to be released and lowered to the "Mr. Burt" via the crane.
[4] It is a reasonable conclusion that Panarello was in a hurry. He testified he worked 28 straight hours, was tired and wanted to go home. Perkins testified that when Panarello advised him by radio that the job was complete and tugs had been ordered, Panarello said "c'est la vie". Plaintiff overheard that conversation as he was still on the "Mr. Burt". Thus, all the evidence points to the fact that Panarello left before plaintiff.
[5] The ATHOL's loading operations were behind schedule and there was another ship waiting to move into the ATHOL's berth. It is conceded the ATHOL was not in haste to leave New Orleans because it was waiting to receive spare engine parts. However, there was an urgency to move it away from the dock.
[6] The longshoremen working on the coal barges went ashore via the ATHOL's gangplank. Panarello was present when that occurred. The crew of the "Mr. Burt" reached shore via a tug boat.
[7] Those include contacting the pilot; staying on the ship; contacting Ralph Perkins, his derrick superintendent; contacting another crew member; calling to C/TS's mooring crew for help.
[8] C/TS's vice president, Manelik Pou, testified that everybody does it.
[9] Those circumstances include the haste of the ship to move from its dock because of the "behind schedule" loading operations; the crew's abrupt reaction to plaintiff's presence on the ship; the fact that the "Mr. Burt" had pulled away, the "language barrier"; the absence of the C/TS ship superintendent and, of course, the absence of the gangway.
[10] Plaintiff's testimony indicates that he was not working at any job at the time of this trial. C/TS is apparently referring to a job plaintiff had in 1993 at which his duties included some painting. Plaintiff specified that he only painted items within his reach and he did not do any climbing.
[11] Apparently this is the date the form was created.
[12] Singapore argued in the alternative (in case we upheld indemnification) that the prejudgment interest against C/TS was error.