STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

02-1223

JUAN LOPEZ

VERSUS

MARINE DRILLING COMPANY, ET AL.

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT
PARISH OF VERMILION, NUMBER 70182
HONORABLE MARCUS A. BROUSSARD, JR.
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Billie Colombaro Woodard, Oswald A. Decuir, Glenn B. Gremillion, and Elizabeth A. Pickett, Judges.

**Thibodeaux, J., dissents and assigns written reasons**

**Decuir, J., dissents for reasons assigned by Judge Thibodeaux.**

AFFIRMED.

George Arthur Flournoy
Flournoy, Doggett & Losavio
P. O. Box 1270
Alexandria, LA 71309-1270
(318) 487-9858
COUNSEL FOR PLAINTIFF/APPELLANT
    Juan Lopez

Paul G. Moresi  Jr.
Moreis & Moresi
P. O. Box 1140
Abbeville, LA 70511-1140
(337) 898-0111
COUNSEL FOR PLAINTIFF/APPELLANT
    Juan Lopez

**Douglas C. Longman  Jr.**
**PERRET, DOISE, APLC**
**P. O. Drawer 3408**
**Lafayette, LA 70502-3408**
**(337) 262-9000**
**COUNSEL FOR DEFENDANT/APPELLEE**
     **Baroid Drilling Fluids,**
     **Baroid Division of Dresser Industries, Inc.**

**Dean Anderson Cole**
**LaBorde & Neuner**
**P. O. Box 52828**
**Lafayette, LA 70505-2828**
**(337) 237-7000**
**COUNSEL FOR DEFENDANT/APPELLEE**
     **Tidewater Marine, Inc.**

**Charles A. Mouton**
**Preis, Kraft & Roy**
**P. O. Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**COUNSEL FOR DEFENDANT/APPELLEE**
     **Marine Drilling Company**
     **Mar-Drill, Inc.**

Gremillion, Judge.

The plaintiff, Juan Lopez, appeals the judgment of the trial court representing a jury verdict finding no liability on the part of the defendants, Tidewater Marine, Inc., Marine Drilling Company, and Baroid Drilling Fluids, Baroid Division of Dresser Industries, Inc., and dismissing his claims against them with prejudice. We affirm.

## FACTS

Lopez was employed as a mechanic trainee by Marine Drilling on the Drilling vessel MARINE 300, in state navigable waters off the coast of Vermilion Parish, Louisiana. In the early morning hours of November 28, 1996, he suffered an injury to his left knee, while disembarking from the M/V SHEFFIE TIDE at a dock run by Baroid in Freshwater City, Louisiana. The M/V SHEFFIE TIDE was owned and operated by Tidewater and was chartered by W & T Offshore, Inc. to provide services in connection with its offshore drilling contract with Marine Drilling.

Lopez filed suit against Marine Drilling and Baroid seeking damages for his injury. In response, Marine Drilling answered and filed a third-party demand against Tidewater. Thereafter, Lopez filed a supplemental petition adding Tidewater as a defendant. Following a jury trial, the jury rendered a verdict finding no liability on the part of Marine Drilling, Baroid, or Tidewater in causing Lopez's accident. Judgment was rendered by the trial court in their favor dismissing his claims against them with prejudice. The trial court further dismissed the third-party demand of Marine Drilling against Tidewater with prejudice. This appeal by Lopez against Marine Drilling and Tidewater followed.

1

## ISSUES

On appeal, Lopez argues that the jury erred as a matter of law in finding that neither Marine Drilling nor Tidewater breached their duties owed to him, and, in the alternative, that its conclusion was manifestly erroneous.[1]

## LAW

The law pertaining to a Jones Act claim was laid out by the supreme court in *Foster v. Destin Trading Corp.*, 96-0803, pp. 3-4 (La. 5/30/97), 700 So.2d 199, 208 (on rehearing):

> The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. § 688 (1994). The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment but proof of negligence is essential to recovery. *See id.* Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. *See Davis v. Hill Engineering, Inc.,* 549 F.2d. 314, 329 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. *Gautreaux v. Schurlock Marine, Inc.*, 107 F.3d 331, 335-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. *Id.* at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. *Id.* at 339.

---

[1] Although Lopez's Motion and Order for Devolutive Appeal does not designate which parties he is appealing against, he notes in his appellate brief that he is not appealing the judgment rendered in favor of Baroid. As a result, Baroid has filed a Motion for Partial Dismissal of Appeal seeking to have his appeal against it dismissed. The motion was referred to the merits of this appeal. In light of Lopez's failure to appeal the judgment against Baroid, its motion to dismiss his appeal against it is hereby granted.

General maritime law is settled that a shipowner owes the duty of exercising reasonable care towards persons lawfully aboard its vessel, who are not members of the crew. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406 (1959); *Dean v. Ramos Corp.*, 00-1621 (La.App. 5 Cir. 2/28/01), 781 So.2d 796. Included in this duty is the provision of a safe manner of ingress and egress. *Guillory v. Cameron Offshore Servs., Inc.*, 422 So.2d 592 (La.App. 3 Cir. 1982).

In order to succeed in his claim, Lopez must prove that either Marine Drilling or Tidewater owed him a duty, that there was a breach of their duties, that he suffered an injury, that there was a causal connection between Marine Drilling and Tidewater's conduct and his injury, and that this harm was reasonably foreseeable. The applicable standard of review in Jones Act and general maritime cases is manifest error. *Ates v. Mallard Bay Drilling Inc.*, 01-836 (La.App. 3 Cir. 12/12/01), 801 So.2d 653, *writ denied*, 02-0100 (La. 3/15/02), 811 So.2d 915.

In both instances, Lopez argues that Marine Drilling and Tidewater both violated their own safety policies by failing to provide him with a gangway as a means of egress from the M/V SHEFFIE TIDE. However, after reviewing the record in its entirety, we find that the jury was presented with differing views of the evidence concerning whether Lopez was provided with a safe means of egress and as to the cause of his accident. Thus, pursuant to *Stobart v. State, Through DOTD*, 617 So.2d 880 (1993), we cannot say that it was unreasonable for the jury to conclude that neither Marine Drilling nor Tidewater was liable to Lopez and that the sole cause of his accident was his own negligence.

3

**SAFE MEANS OF EGRESS**

Lopez presented evidence establishing that it was unsafe for him to disembark from the M/V SHEFFIE TIDE by climbing over the gunwale of the vessel and then climbing down the tires chained to its stern in order to reach the dock, which was located approximately two to three feet below the vessel. Two experts testified for him on the issue of whether Marine Drilling and Tidewater breached their duties of providing him with a safe means of disembarking from the M/V SHEFFIE TIDE. Frank Buck, a retired captain and former employee of Tidewater, was accepted as an expert in the field of safe motor vessel operations. Robert Borison, the president of Total Safety Services, Inc., was accepted as an expert in safe work practices.

Buck testified that Lopez's accident would not have occurred had he been provided a gangway to disembark from the M/V SHEFFIE TIDE. He opined that crews typically do not climb over a vessel's stern and then down the tires in order to access the dock. He stated that gangways are vital for the safety of passengers and that all of the Tidewater vessels he worked on, as far back as 1964, and other companies's vessels, were provided gangways. Buck explained that it is the responsibility of the captain to ensure the safe ingress and egress of passengers from his vessel. However, he did not feel that the use of gangways should be left to the captain's discretion, rather, he stated that a company's rules should mandate their use.

Buck testified that captains typically do not carry gangways on crew boats, but explained that they are easy to disassemble and could be left at the location where the crew boats loaded and offloaded passengers. However, he admitted that a member of the vessel would have to exit the vessel over the stern and climb down the

4

tires in order to set up the gangway. This, he stated, did not make the practice safe. He further stated that he had captained vessels out of Freshwater City, and said that the tides there could fluctuate as much as two feet. He did not dispute a witness's statement that there was five to six feet between the deck of the M/V SHEFFIE TIDE and the dock.

Buck inspected the M/V SHEFFIE TIDE, which is now the M/V PEGGY LEE, and stated that the setup of tires on her stern was typical. He further admitted that the M/V SHEFFIE TIDE was a Coast Guard inspected vessel, but stated that he was unaware of any Coast Guard regulation requiring this type of vessel to carry a gangway. He opined that the type of gangway shown to the jury would be adequate, although he was unsure if its twelve foot length would be suitable for a five to six foot drop in elevation. He measured the free board of the M/V SHEFFIE TIDE, the distance between her deck and the water's surface, which was approximately seven feet, and determined that the gunwale was twelve and one-half inches from the deck. He also measured the tires, which were approximately four feet from top to bottom. However, Buck testified that he did not calculate the steepness of the angle if a gangway was used from the stern of the M/V SHEFFIE TIDE, and the vessel rode four feet above the dock's surface. He admitted that it might be too dangerous to use a gangway if the angle from the vessel to the dock was too steep.

Borison opined that an employer's most important responsibility is to provide its employee with a means of safe ingress and egress on the job. He further opined that all employers have the responsibility of providing gangways for their workers on rigs, and that fault in this incident belonged to Marine Drilling and

5

Tidewater for not providing Lopez with one. He testified that using the tires to climb down the M/V SHEFFIE TIDE was a violation of Marine Drilling's own accident prevention and investigation policy. This policy states, "Marine Drilling's Safety Program is based on recognizing and eliminating the two main accident causes; unsafe acts and unsafe conditions." Attached to Marine Drilling's manual is the International Association of Drilling Contractor's (IADC) Accident Prevention Reference Guide, which states in part, "K. Personnel should not use boxes, chairs, sawhorses, tables, etc., to improvise a ladder." Borison stated that James Guidroz, the Marine Drilling supervisor on board the M/V SHEFFIE TIDE, was responsible for ensuring that all Marine Drilling employees exited the vessel safely. However, he admitted that he did not refer to the IADC's Accident Prevention Reference Guide's crew boat safety procedures before reaching his opinion. Nor did he have any opinion about the guide's failure to require drilling contractors to provide gangways. Borison testified that Lopez's accident was caused by an unsafe condition, the lack of a gangway, and not from any action on his part. He stated that the unsafe condition could have been eliminated easily and inexpensively during the five month period that Marine Drilling used the Freshwater City dock. He further differentiated between a step and a jump, describing a step as when both the trailing and leading foot are in contact with the area being left/reached. He stated that a jump occurs when the leading foot is in contact with the area trying to be reached, but the trailing foot is no longer in contact with the area left. He described the difference between a step and a jump as typically being twelve to fifteen inches. He opined that the two to three foot drop from the tires on the M/V SHEFFIE TIDE'S stern to the dock would be a jump

6

rather than a step.

Borison testified that he did not feel that it was safe for workers to exit a vessel, which was three to five feet above the dock and one to three feet from the dock, by climbing down the tires. He stated that he would rather they use a gangway. He further opined that climbing over the stern was not how workers commonly disembarked from small crew boats during the 1990's. Borison testified that he visited every dock in Intracoastal City in 1992, and determined that, of the ten to fifteen docks he visited, only two did not provide gangways. Had he been on board the M/V SHEFFIE TIDE, Borison stated that he would have disembarked in the same manner as Lopez. He further stated that he could not recall a crew boat ever having a gangway as part of its appurtenances and he admitted that swing ropes and personnel baskets were used all the time in the oil field, and that both were very hazardous.

Lopez testified that workers routinely disembarked from the crew boat by climbing down tires located at the stern of the vessel and then crawling or jumping down onto the dock. He stated that some of his co-workers sat on the tires before getting down. He testified that the tires were welded onto the vessel with chains and were securely fastened. He likened climbing down the tires to climbing down a ladder and agreed that it could be performed without accident, if done carefully.

Lopez stated that the M/V SHEFFIE TIDE was not tied up flush against the dock and that there was approximately one and one-half to two feet between the vessel and the bulkhead of the dock. He further stated that he was hanging by his knee above the water after he fell. However, in his December 4, 1996 statement, he stated that the M/V SHEFFIE TIDE was right up against the dock when he fell, but

7

that it rode four feet above the dock. He also stated that he landed on his back on the ground comprising the dock. However, during his testimony, he denied landing on his back, stating that he would have cut his back up had he done so.

Scott Causey, a derrick hand for Marine Drilling in 1996, testified that no gangway was provided for them to exit the M/V SHEFFIE TIDE, and that the only way to exit the vessel was by climbing over the gunwale located at the stern, stepping onto the tops of the tires, and then climbing down to the dock. He stated that the M/V SHEFFIE TIDE was pushed up against the dock and the tires were against the dock, although not perfectly flush against it. Causey testified that he sometimes jumped down from the tires onto the dock, but that he remembers the vessel riding high in the water on the date of Lopez's accident, approximately two to three feet above the dock.

Keveran Ned, a Marine Drilling employee in 1996, testified that employees were never provided a gangway during the time Marine Drilling used the Baroid dock at Freshwater City. He stated that the only way to get off the vessel was to climb over the stern and down the tires. He stated that there was approximately a two to three foot drop from the tires to the dock, and that this was normal depending upon the tides. Ned testified that he normally jumped down from the tires to the dock prior to Lopez's accident, but that he stopped doing so afterwards. He stated that women getting off the vessel would sit down on the top of the tires before climbing down. Although he testified that he had never hurt himself while disembarking from crew boats in this manner, he stated that the practice was dangerous. If he had been provided a gangway, he said that he would have used it.

8

John Dixon, an offshore cook, testified that no gangways were ever provided for Marine Drilling's workers at the Baroid dock. After learning of Lopez's accident, he stated that he called the Coast Guard in Port Arthur, Texas, and asked if they had jurisdiction to require crew boats to provide gangways. If a gangway was provided, he testified that a captain would require his passengers to use it. Dixon further stated that he had never been hurt disembarking from a vessel in this manner, and he felt that a worker, who was careful, could disembark in this fashion without suffering an accident. However, he did not feel that the practice was safe. Additionally, he testified that he was not present when the accident occurred, and that he did not know where the M/V SHEFFIE TIDE docked the morning of the accident.

A host of witnesses testified that the manner provided for Lopez to disembark from the M/V SHEFFIE TIDE was safe. Baroid employees, Gary Humble, manager of the Freshwater City dock, and Pivon Dupius, facility coordinator and operations supervisor of the dock, both testified that crew boat companies operating out of the dock customarily loaded and offloaded passengers in this manner.

James Guidroz, a driller for Marine Drilling, was on the M/V SHEFFIE TIDE the morning of Lopez's accident. He testified that the crew boat was tied up flush to the dock, but was riding approximately two and one-half to three feet above the dock, which he stated was normal. He was assisting Randy Malenca, an injured worker, down from the tires located at the crew boat's stern at the time of Lopez's accident. He stated that there was no gap between the M/V SHEFFIE TIDE and the dock, otherwise Malenca would have fallen into the water.

Guidroz testified that he disembarked from the crew boat by stepping

9

over the gunwale and down onto the top of the tires located there. He stated that the then put his foot into the middle of a tire, before stepping down onto the dock. He testified that he has been getting off crew boats in this manner for the entire twenty-five years that he has worked offshore, including crew boats operated by companies other than Tidewater. However, he stated that he will use a gangway if provided and if safe to do so.

Ronnie Lambert, a maintenance supervisor for Marine Drilling, testified that he has boarded and exited crew boats by climbing down tires located at their sterns for the sixteen years he has worked offshore. He stated that rig workers are commonly not provided with gangways to access vessels, and he could think of only one dock where an oil company had a permanent gangway. He further stated that he could safely board or exit a crew boat in this manner if he was careful.

Sam Galle, an engineer and deck hand aboard the M/V SHEFFIE TIDE at the time of Lopez's accident, testified that he has worked on crew boats since 1978, and that crews generally boarded and exited the vessels by climbing over the stern via the tires located there. He stated that gangways are rarely used by crew boats of this size and that he has seen situations where the use of a gangway would be unsafe. He further testified that the M/V SHEFFIE TIDE is a Coast Guard inspected vessel, and that inspectors from the Coast Guard boarded the vessel in this same fashion.

Galle testified that the M/V SHEFFIE TIDE was backed up flush with the Baroid dock on the date of Lopez's accident, and that there was no space between the tires and the bulkhead. He described the slip where the boat was tied up as a dead-end slip, and stated that there was no wave action in the slip. Galle stated that he got

10

off the vessel by climbing over the gunwale and then down the tires to the dock. He estimated that the M/V SHEFFIE TIDE rode five feet above the dock. He further could recall no problems with the lighting at the dock.

Malenca, a Marine Drilling roustabout, testified that he had injured his knee the week prior while working on the rig. He stated that he disembarked from the M/V SHEFFIE TIDE by sitting down on the gunwale and then pushing himself onto the tires. He stated that two guys on the dock helped him off the tires so that he would not have to jump down. He testified that the tires were approximately three feet above the dock, which he stated was normal. Malenca stated that he exited crew boats in this manner at other locations for Marine Drilling and that he has never complained of this practice being unsafe, nor has he heard anyone else doing so.

Robert Arceneaux, the Director of Health, Safety, and Environmental management for Tidewater and a former crew boat captain, testified that safety is paramount to Tidewater. However, he stated that Tidewater's safety standards do not require its small crew boats, such as the M/V SHEFFIE TIDE to carry gangways. He testified that Tidewater has approximately 250 vessels working in the Gulf of Mexico, of which approximately ten are of the 100 foot crew boat class, like the M/V SHEFFIE TIDE. Arceneaux testified that smaller crew boats do not carry gangways because they have limited deck space and because they ride higher in the water, such that the angle created by a gangway might be so steep that it would not be prudent to use.

Arceneaux testified that Tidewater's policy relating to gangways was

11

outlined in its 1995 Safe Operations System Manual. In the section dealing with access to vessels, it states, "Gangways with handrails or steps with handrails should be provided where practical. If not practical, extreme caution should be used." The 1972 Manual of Safe Work Practices provided, "Gangways will be provided where practical." Arceneaux stated that the responsibility for the safety and well being of the vessel, crew, and passengers rests with the vessel's master. This includes the determination of whether it would be practical to use a gangway, if provided. He further testified that it is the vessel owner's responsibility to know, maintain, and support company safety policies. However, he stated that Tidewater and other operators believe that climbing down tires located off the stern of a vessel is a safe, practical, and effective practice. He testified that Coast Guard inspectors board the smaller crew boats in this fashion, as do officials from the American Bureau of Shipping, and other government officials.

Arceneaux further stated that Tidewater's policy has never required its crew boats to use gangways. In its Safeop Lesson Plans, pertaining to persons in addition to the crew, it states that mates should, "Advise to use care when leaving boat; always use gangway." Arceneaux testified that the lesson plans have never constituted Tidewater policy, rather, they are training guidelines and safety meeting topics. He further stated that Tidewater has larger vessels which do carry gangways, and that the lesson plans were written to try and address all of the needs of all of its vessels, large and small. Finally, Arceneaux testified that he had no problem with his crew climbing down a two to three feet drop to the dock when he was a captain, and that he still has no problem with this practice now that he is a safety officer.

12

After reviewing the evidence presented, we find that the jury was clearly presented with differing views pertaining to whether Marine Drilling and Tidewater provided Lopez with a safe means of egress from the M/V SHEFFIE TIDE. Lopez's witnesses testified that requiring him to climb over the stern of the crew boat and then down the tires located there before having to jump down to the dock, a distance of approximately two to three feet, did not meet this requirement. However, Tidewater and Marine Drilling's witnesses testified that disembarking from a vessel in this fashion has been a normal practice in the oilfield for at least twenty-five years, and that even the Coast Guard inspectors used this means in order to access the vessel during its annual inspection.

Finally, what constitutes a means of safe egress is a fact driven determination based on the size of the vessel, its distance from the dock, its height above the water, and the size of the provided gangway. The testimony regarding the height at which the tires were located above the dock on the night in question varied from two to five feet. Depending on the actual height that the M/V SHEFFIE TIDE was riding above the dock, there was testimony that the use of a gangway may have been more dangerous than climbing over the vessel's stern. Finally, considering the fact that all of the other passengers on board that night were able to safely disembark over the stern, we cannot say that the jury was manifestly erroneous in finding that Tidewater and Marine Drilling did not breach their duty of providing Lopez with a safe means of egress from the M/V SHEFFIE TIDE.

**COMPARATIVE NEGLIGENCE**

13

Lopez further argues that the jury's verdict finding that he was the sole cause of his accident is manifestly erroneous. As stated previously, "the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances." *Foster*, 700 So.2d at 208.

Lopez testified that he and other members of the day shift were allowed to leave the MARINE 300 early because of Thanksgiving. He stated that the M/V SHEFFIE TIDE reached the Baroid dock at Freshwater City at around midnight on November 28, 1996. On the morning in question, he stated that he was carrying a duffle bag filled with his belongings, including some breakable items. To protect these, Lopez stated that he set his bag down on the gunwale before climbing over it and stepping onto the rim of a tire, which was hanging approximately one foot below the vessel's deck. In describing what happened next, he stated, "Then I reached over like that, grabbed my bag, and I squatted down to lower myself to let my bag go like that. And when I let go of my bag, my foot went; and then all I remember I was hanging there."

Lopez testified that the duffle bag weighed approximately forty to fifty pounds. Although he admitted that he could have dropped the bag down onto the dock, handed it down to someone, or asked someone to hand it down to him, he stated that he did not do so because no one else asked for help. Lopez further testified that he thought he grabbed the duffle bag with one hand, because if he had grabbed it with both hands and tried to pull it over, he would have slipped. However, in his December 4, 1996 statement, he stated that he reached over the railing and grabbed his duffle bag with both hands. He also disagreed with the testimony of Ned, who testified that

14

Lopez stepped off the tire and that the vessel was flush against the dock. When questioned if the accident would have happened if he had either dropped his bag onto the dock before climbing over or asked someone for help, Lopez stated, "Probably not."

Causey testified that he was helping Malenca off the M/V SHEFFIE TIDE when he looked down and saw that Lopez had fallen and was hanging upside down from a tire. When he got off the crew boat, he stated that he climbed over the gunwale and was facing the vessel's bow as he climbed down the tires. With regard to duffle bags, Causey stated that they normally placed all of the bags at the back of the vessel and then handed them down once everyone had disembarked. He stated that it was safer to hand the bags down. Although he could not recall how Lopez's bag got off the M/V SHEFFIE TIDE, he stated that he would have handed it down to him had he asked for help.

Ned was listed as a witness to the accident in Marine Drilling's first report of injury. On the morning in question, he stated that he was standing behind Lopez, waiting to get off of the M/V SHEFFIE TIDE. He stated that Lopez stepped over the gunwale and onto the tires and was facing away from him, so that he was looking at the back of Lopez's head and shoulders. He stated that Lopez was carrying his duffle bag in one hand and his overalls in his other hand. He understood that Lopez intended to step onto the tire and then step forward onto the dock, but he stated that Lopez just disappeared. Ned yelled and jumped down from the vessel to help Lopez, who was hung up by his foot in the tire.

Dixon testified that he would sometimes hand his bag down to someone

15

else when he was getting off a crew boat, or that he would have someone hand it down to him after he disembarked. He stated that he never tried to get down while holding his bag in his hand because he considered this unsafe.

Guidroz did not see Lopez's accident because he was helping Malenca down from the vessel. However, he stated that he does not hold onto his luggage while exiting a crew boat. He testified that he either throws it down onto the dock or he hands it down to someone already on the dock. Lambert testified that he took a statement from Lopez on December 17, 1996, which states: "Rec. statement by phone 12-17-96 - Departing crew boat with baggage Employee put foot on edge of tire - foot slipped into tire. Employee fell." Lambert stated that he read this statement back to Lopez, who agreed that it was correct. He further stated that his impression was that Lopez was facing the dock when his foot slipped.

Galle testified that he tied up the M/V SHEFFIE TIDE on the morning in question and then assisted the Marine Drilling workers off the vessel. He did not see Lopez's accident; however, he stated that someone told him about the accident and then he immediately reported it to his captain. He stated that he filled out an accident report at the request of Marine Drilling at a later time. The statement provides, "On 11-28-96 one man stepped of (sic) the Sheffie Tide. Stepped in a hole on the dock while getting off the Sheffie Tide. I Sam Galle asked the man if he was O.K., and he stated to me that he was O.K. This incident happened during crew change." Galle stated that the person who was involved in the accident did not mention anything about the incident involving the M/V SHEFFIE TIDE or a tire. However, Galle could not say if the person described in the accident report was Lopez.

16

Malenca testified that he did not see Lopez's accident because he was being helped down from the M/V SHEFFIE TIDE at the same time that Lopez was disembarking. He stated that Lopez was already on the ground by the time that he got down onto the dock. However, had he not been injured, Malenca stated that he would have put his bag down, placed one foot on the tire, and then climbed down to the dock.

Buck testified that he understood that Lopez faced the cabin of the M/V SHEFFIE TIDE, turned around, and then backed up. He stated that he then stepped onto the tire and put his foot down in the bottom rim of the tire. At this point, when he started to lean over, his foot slipped and went into the tire, causing him to become hung up in the tire. Buck stated that a worker disembarking in this manner should always hold onto something while doing so, and that it would be unsafe for a worker to get off of a crew boat without holding on. He further testified that it would be very foolish for a worker to jump down from the tires at night, especially with something in each hand.

Borison testified that he did not think Lopez had his duffle bag in his hand while he was trying to disembark. However, he stated that it would not matter if he did, since Lopez's accident could have occurred in the same manner with or without the duffle bag. He further testified that it would be unsafe for Lopez to try and climb down from the crew boat while carrying his duffle bag in his hand.

The jury was presented with three possible scenarios as to the cause of Lopez's accident. In his statement, Lopez said that he reached over and grabbed his

17

duffle bag with both hands, however, at trial, he stated that he only reached over with one hand. He stated that he did not think he would have used both hands because had he tried to do so he would have slipped, which is exactly what happened. The second scenario was provided by Ned, the closest thing to an eyewitness in this matter, who stated that Lopez stepped over the gunwale of the M/V SHEFFIE TIDE while carrying his coveralls in one hand and his duffle bag in the other hand, and that he then proceeded to step off the tires onto the dock. This testimony is substantiated by the statement taken by Lambert on December 17, 1996. The final version is supplied by Lopez, wherein he placed his duffle bag on the deck of the vessel, stepped over the gunwale and onto the tire, reached over the gunwale with one hand and picked up his bag, and then squatted down in order to drop the bag onto the dock, at which time he slipped and became hung up in the tire.

Considering the conflicting testimony presented as to the exact cause of Lopez's accident, we cannot say that the jury was unreasonable in finding that neither Marine Drilling nor Tidewater were at fault in this instance. Accordingly, the judgment of the trial court finding no fault on the part of Marine Drilling and Tidewater is affirmed. Lopez's assignment of error is dismissed as being without merit.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to the plaintiff-appellant, Juan Lopez.

**AFFIRMED.**

18

JUAN LOPEZ

VERSUS

MARINE DRILLING COMPANY, ET AL.


THIBODEAUX, J., dissenting.

Generally, an appellate court gives great deference to the trier of fact's findings as long as its conclusions are reasonable ones. However, as a reviewing court, we are also guided by the law set out in *Stobart v. State, Through DOTD,* 617 So.2d 880, 882 (La.1993) and *Rosell v. ESCO*, 549 So.2d 840, 844-45 (La.1989), which adds "where documents or objective evidence so contradict the witness's [testimony], . . . [a] court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." After examining the objective evidence, I conclude that Tidewater and Marine Drilling were required to provide safe egress from the M/V SHEFFIE TIDE. Further, I find no support for defendants' arguments that their duty to provide safe egress from the vessel via a gangway depended upon whether the vessel was a small or large crew boat.

Throughout the Tidewater Safe Operations System Manual, Tidewater promotes safety and precautionary measures to prevent injuries to crew members as well as other authorized personnel as they move to and from and about the boat. According to the manual, "the number one cause of injuries on [their] boats has always been falling down." Additionally, "[a] high percentage of accidents occur while

vessels are in port at dockside," as in the case of Mr. Lopez. Mr. Lopez testified as well as many others that the only means of disembarking the M/V SHEFFIE TIDE was the tires located on the stern of the boat. In examining this safety manual, it is clear that this means of disembarking from the boat contradicts the safety measures imposed by Tidewater.

As a precautionary measure to "Prevent slips, trips, and falls," the manual specifically states "Rig gangway," when disembarking a vessel. Under the "Dockside Safety" section of the manual, the policy reads: "Gangways should be deployed whenever practical and secured properly, and should have handrails sturdy enough to prevent a person from falling off the gangway. Extreme caution must be exercised when a gangway cannot be deployed." Additionally, "[a]pproaches to gangways on the dock and on the vessel should be unobstructed; properly lighted and steps and platforms to provide access to gangways should not create hazardous conditions."

When Mr. Lopez was injured, no gangway was provided for safe ingress and egress from the boat. Mr. Arceneaux asserts a gangway is not required on smaller crew boats. I find no evidence in the manual that gangways are not required for smaller crew boats and that the policy provisions differ depending on whether the boat is smaller or larger. Even if Mr. Arceneaux is correct, there were clearly no handrails or other apparatus that would assist Mr. Lopez in disembarking from the boat safely. The failure to attach a gangway was hazardous and Tidewater should have recognized that injuries may occur without the use of a gangway.

Further, Mr. Arceneaux asserts that limited deck space prevents a gangway from being placed aboard smaller crew boats. However, a gangway could have been left dockside without interfering with the deck space. The manual indicates that crew members should be instructed "to use care when leaving [a] boat; **always use**

2

**gangway.**" (Emphasis added). Again, I find no evidence that this rule applies to *specific* vessels.

Mr. Arceneaux states that the lesson plans contained within the manual have never constituted Tidewater policy per se; however, I find it difficult to believe that Tidewater would trouble itself with producing such an extensive manual on safety without implementing and following its own policies and guidelines. This argument has no merit.

The manual also contains policies stating that gangways should be used whenever practical. Mr. Arceneaux's testimony indicated that the use of a gangway is at the discretion of the captain or master of the vessel. Under "Responsibilities of the Master," the Master is responsible for the safety and well-being of the vessel's crew and any other persons on board, and the safety of the equipment/cargo carried on board . . . . The master is responsible for knowing and adhering to the provisions of the SOS [Safe Operations System] manual." As I read this provision, the master is required to follow the policies of the manual, including using a gangway, and ensuring safety is not at his discretion. Even if Mr. Arceneaux is correct in his assertion, Tidewater has not shown that the use of a gangway, under the circumstances, was impractical.

Further, Mr. Arceneaux provided in his testimony that "Tidewater's Safe Operations Manual is a document that was written to give our crews guidance for operation of their vessels; and it covers everything from our basic policy, where we're saying **safety is our highest priority**, to operation of the vessel." (Emphasis added). Additionally, he stated that "we wrote a manual that we hoped would provide guidelines and address issues for **all** of our boats." (Emphasis added). Therefore, it is clear that Tidewater's policies apply to *all* of its vessels, rather than distinguishing one class of boats from another class, as Tidewater has done as an afterthought and in preparation for trial of this case.

3

Similarly, Marine Drilling has attached to its manual an Accident Prevention Reference Guide produced by the International Association of Drilling Contractors which states that "Personnel should not use boxes, chairs, sawhorses, tables, etc. to improvise a ladder." The tires located on the stern of the boat were used to improvise a gangway and created an unsafe condition despite Marine Drilling's policies on safety which guard against "unsafe acts and unsafe conditions." Using tires, rather than a gangway, to disembark from a boat is comparable to using one of the above apparatus to improvise a ladder. Surely, the use of tires, particularly wet tires, does not equate to the use of a gangway.

Both Tidewater and Marine Drilling are liable for Mr. Lopez's injuries. "[G]eneral maritime law imposes on a vessel owner a duty to provide a reasonably safe means of access for those boarding or leaving the vessel." *Walton v. Cooper/T. Smith Stevedoring*, 97-0100, p. 9 (La.App. 4 Cir. 3/4/98), 709 So.2d 941, 946. Tidewater failed to provide a gangway, as stated in its safety manual, for safe ingress and egress from the M/V SHEFFIE TIDE. As a result, Mr. Lopez had no other means of disembarking from the vessel other than to use the tires located on the boat's stern. Tidewater *failed to follow its own safety policies*. I conclude that Tidewater is sixty-five percent liable for the injuries of Mr. Lopez.

Marine Drilling is also liable for Mr. Lopez's injuries. "The Jones Act employer owes his employee-seaman the duty to provide a safe working area and proper equipment." *Walton,* 709 So.2d at 945. Just as Tidewater had a duty to provide a gangway for disembarking the boat, Marine Drilling had a duty as employer to ensure that its personnel worked under safe conditions. Tidewater's obvious duty to provide a gangway, however, does not negate Marine Drilling's duty. According to its safety regulations, Marine Drilling had a duty to guard against unsafe acts and conditions. Any hazardous situation present on the vessel and dock was a substantial reason for

4

Marine Drilling to ensure that a gangway was provided. Marine Drilling's duty to its employees did not end once its personnel had gone aboard the vessel. For this reason, I would impose thirty-five percent fault on Marine Drilling.

The majority's focus on the plaintiff's comparative negligence is puzzling. It concludes that "we cannot say that it was unreasonable for the jury to conclude that neither Marine Drilling nor Tidewater was liable to Lopez and that the sole cause of his accident was his own negligence." The trial court's judgment incorporated the first three interrogatories on the jury's Special Verdict form dealing with the negligence of Marine Drilling, Tidewater, and Baroid Drilling. The judgment then read, "[c]onsidering the above findings having been made by the jury, the Court enters the following judgment." The jury never reached Interrogatory 6 on the Special Verdict form which asked, "Do you find by nine or more jurors that Juan Lopez was negligent which was a cause of the accident in question?"

However, even if it is proper to address the issue of Mr. Lopez's negligence, a reading of the *entire* record leads to the inescapable conclusion that he was not at fault. The plaintiff's theory, we must remember, was that the absence of a gangway was the cause of his injuries. Mr. Lopez testified that "[t]he slip came *after* I let go of the bag." (Vol. III, p. 579). (Emphasis added). In response to the question, "So you had already let go of the bag; and then you slipped?," Mr. Lopez answered, "yes, sir. I let go of the bag, and I was probably going to turn to lower myself down. And that's probably when it happened."

Furthermore, Frank Buck, one of the experts retained by the plaintiff, testified that "[i]f you would have had a gangplank, this accident would not have happened." The safety consultant, Robert Borison, explained that, in his professional opinion, Mr. Lopez did not do anything unsafe under the circumstances that caused his injury. He further explained that Mr. Lopez would have been injured in the same

5

manner *even if he did not have a duffle bag*. The reason for this is simple. According to Mr. Borison, "[t]he unsafe condition [was] the failure to provide a gangway. . . and the hazards associated with the various types of ingress and egress from this vessel could have been prevented and would have been prevented if a gangway was provided."

The majority's emphasis on Mr. Lopez's comparative negligence is even more puzzling because Mr. Lopez had nothing to do with the failure to provide a gangway—the main point of contention in this case. We do not know if the jury even considered the duffle bag argument. As I previously indicated, the jury was not required to address Interrogatory 6 on the Special Verdict form. It determined only that a gangway was not a necessary means of egress and ingress. The *objective* evidence and even the defendants' own *objective* rules and regulations belie this conclusion.

For the foregoing reasons, I dissent.